THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WILLIAMS, Defendant-Appellant.

Fourth District   No. 4—04—0610

Opinion filed May 5, 2006.

Daniel D. Yuhas and Colleen Morgan, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Brown, State's Attorney, of Pontiac (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In April 1997, defendant, Michael Williams, pleaded guilty to

criminal damage to government-supported property (720 ILCS 5/21—4(1)(a) (West 1996)) in case No. 97—CF—20 and aggravated battery upon a correctional-institution employee (720 ILCS 5/12—4(b)(6) (West 1996)) in case No. 97—CF—75. In exchange for defendant's guilty plea, the State agreed to recommend that defendant be sentenced to three years in prison for criminal damage to government-supported property and seven years in prison for aggravated battery, with those sentences to be served consecutively to each other and consecutively to sentences defendant was already serving. The trial court accepted defendant's guilty plea and sentenced him in accordance with the parties' agreement.

In June 2004, defendant *pro se* filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 through 122—8 (West 2004)), alleging that in April 1997 (1) he was unfit to plead guilty because he suffered from "several diagnosed mental illnesses" and was "most likely borderline retarded" and (2) he received ineffective assistance of trial counsel in that his counsel failed to (a) inquire as to whether he was competent to plead guilty and (b) request a fitness hearing. The trial court later dismissed defendant's petition as frivolous and patently without merit (725 ILCS 5/122—2.1(a)(2) (West 2004)).

Defendant appeals, arguing that the trial court erred by dismissing his postconviction petition. We disagree and affirm.

## I. BACKGROUND

In February 1997, the State charged defendant, who was then an inmate at Pontiac Correctional Center, with criminal damage to government-supported property (720 ILCS 5/21—4(1)(a) (West 1996)) (case No. 97—CF—20). At his March 1997 arraignment, defendant informed the trial court that he understood his rights and the possible penalties. Defendant also requested court-appointed counsel, and the court appointed counsel to represent him. At a hearing later that month, defendant appeared via two-way video, conferred privately with his counsel via a secure video link, and pleaded not guilty. Defendant also informed the court that he did not have any questions about the proceedings.

In April 1997, the State charged defendant with two counts of aggravated battery upon a correctional-institution employee (720 ILCS 5/12—4(b)(6) (West 1996)) (case No. 97—CF—75), alleging that defendant stabbed a correctional officer. Later that month, defendant appeared in court and the trial court appointed counsel to represent him in that case. At that same hearing, the parties presented written plea agreements in case Nos. 97—CF—20 and 97—CF—75, signed by

defendant. According to the agreements, defendant agreed to plead guilty to criminal damage to government-supported property and aggravated battery upon a correctional-institution employee. In exchange, the State agreed to recommend that defendant be sentenced to three years in prison for criminal damage to government-supported property and seven years in prison for aggravated battery, with those sentences to be served consecutively to each other and consecutively to sentences defendant was already serving.

The State provided the following factual basis for defendant's guilty pleas. In case No. 97—CF—20, on October 30, 1996, defendant, who was then a Pontiac inmate, knocked a hole in a wall and damaged a toilet and sink, resulting in damage totaling $1,173. Defendant admitted causing the damage because he was dissatisfied with the condition of his cell. In case No. 97—CF—75, on February 16, 1997, a correctional officer entered defendant's cell to retrieve an article of clothing. Defendant stabbed the officer in the abdomen with a six- to eight-inch piece of metal. The correctional officer was hospitalized overnight and required surgery on his wound.

The trial court accepted the State's factual bases. The court also fully admonished defendant, outlined the terms of the plea agreements, and informed defendant of the possible penalties. Defendant informed the court that he understood the nature of the charges against him and the possible penalties and he had signed the plea agreements of his own free will. The court determined that defendant was knowingly and voluntarily pleading guilty and accepted defendant's guilty pleas. The court then entered judgment on one count of aggravated battery (causing bodily harm to a correctional-institution employee) and criminal damage to government-supported property and sentenced defendant in accordance with the parties' agreement

Defendant did not file a posttrial motion or a direct appeal. However, in June 2004, he *pro se* filed a postconviction petition, alleging that (1) he was unfit to plead guilty because he (a) suffered from "several diagnosed mental illnesses," (b) had "an extremely low" intelligence quotient (IQ), and (c) was "most likely borderline retarded"; and (2) he received ineffective assistance of trial counsel in that his counsel failed to (a) inquire as to whether defendant was "mentally competent enough and in a normal state of mind" to plead guilty and (b) request a fitness hearing. Attached to defendant's petition were the following: (1) an unnotarized affidavit of defendant, indicating, in part, that (a) he had been diagnosed with several mental illnesses, (b) he had taken certain psychotropic medications during his incarceration, and (c) at the time of his guilty plea he was not thinking rationally or clearly; (2) an unofficial copy of defendant's high

school records from 1982 through 1986, which showed failing grades in most classes, a total of 5.5 graduation credits, and many absences and partial absences from school; (3) a March 19, 1994, letter from a licensed practical nurse in the Madison County sheriff's office to the Illinois Department of Corrections (DOC), indicating that defendant was taking Sinequan and Soma while in jail; (4) a March 1994 medical history completed at Graham Correctional Center, which showed that defendant was then taking Sinequan and Soma; (5) an August 1994 medication-administration record from the Danville Correctional Facility, which indicated that defendant was administered Sinequan and Trilafon; (6) a medication-administration record revealing that in October 1994 defendant was administered trazodone and Trilafon and in November 1994 defendant was administered Trilafon and Sinequan; (7) DOC medical-progress notes, which contained a May 7, 1997, entry indicating that defendant asked to see mental-health personnel to "learn to deal with his violent urges to stab and hurt people"; (8) an October 19, 1997, psychological evaluation conducted at Stateville Correctional Center, which indicated that defendant had reported auditory hallucinations in the past, but not at that time, and " 'blackout' time periods for which [defendant] states he has no memory"; (9) a December 1997 Stateville medication-administration record indicating that defendant had been prescribed trazodone; (10) a February 1998 Menard Correctional Center psychiatric-discharge summary revealing that defendant (a) was not suffering from any mental disorder but had a history of polysubstance dependence and (b) had an antisocial and aggressive personality, for which no psychotropic medication was prescribed; (11) a March 1998 psychiatric evaluation showing that defendant had been diagnosed with intermittent explosive behavior and antisocial personality disorder; (12) a March 1998 Menard mental-health evaluation, which indicated that after the October 30, 1996, incident, defendant was prescribed "depakane" "to help try to control his rage"; (13) a May 1998 psychiatric evaluation from Tamms Closed Maximum Security Facility indicating that defendant had been diagnosed with "([p]robable) rage episode related to low levels of [s]erotonin" and probable antisocial personality disorder; and (14) a September 2003 Tamms psychiatric evaluation indicating that defendant (a) had "been off all psychotropic medication for a fairly long time" and (b) had been diagnosed with (i) "[i]mpulse [c]ontrol [d]isorder in partial remission," (ii) "[p]olysubstance [d]ependence with physiological dependence in a controlled environment," and (iii) antisocial personality disorder.

Later in June 2004, the trial court dismissed defendant's petition as frivolous and patently without merit (725 ILCS 5/122—2.1(a)(2) (West 2004)). This appeal followed.

## II. THE TRIAL COURT'S DISMISSAL OF DEFENDANT'S POSTCONVICTION PETITION

### A. Proceedings Under the Act

■ A defendant may proceed under the Act by alleging that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122—1 (West 2004). A petition filed under the Act must "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122—2 (West 2004). The petition shall have attached "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122—2 (West 2004).

The Act establishes a three-stage process for adjudicating a postconviction petition (725 ILCS 5/122—1 through 122—8 (West 2004); *People v. Jones*, 362 Ill. App. 3d 31, 33, 839 N.E.2d 539, 541 (2005)), and this case involves the trial court's dismissal of defendant's postconviction petition at the first stage. At this stage, the Act does not permit any further pleadings from the defendant or any motions or responsive pleadings from the State. *People v. Jones*, 211 Ill. 2d 140, 144, 809 N.E.2d 1233, 1236 (2004). Instead, the court determines whether the petition alleges a constitutional infirmity that would necessitate relief under the Act. Unless positively rebutted by the record, all well-pleaded allegations are taken as true at this stage. *People v. Coleman*, 183 Ill. 2d 366, 380-81, 701 N.E.2d 1063, 1071 (1998); *People v. Little*, 335 Ill. App. 3d 1046, 1050, 782 N.E.2d 957, 961 (2003).

■ Dismissal at the first stage of postconviction proceedings is warranted when the trial court independently reviews the postconviction petition and determines that "the petition is frivolous or is patently without merit." 725 ILCS 5/122—2.1(a)(2) (West 2002); *Coleman*, 183 Ill. 2d at 380, 701 N.E.2d at 1071. A postconviction petition is considered frivolous or patently without merit only if the allegations in the petition fail to present the " 'gist of a constitutional claim.' " The "gist" standard is " 'a low threshold.' " To set forth the "gist" of a constitutional claim, the postconviction petition " 'need only present a limited amount of detail' " and hence need not set forth the claim in its entirety. *People v. Edwards*, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001), quoting *People v. Gaultney*, 174 Ill. 2d 410, 418, 675 N.E.2d 102, 106 (1996).

In *Little*, 335 Ill. App. 3d at 1050-51, 782 N.E.2d at 962, this court discussed first-stage dismissals of postconviction petitions as follows:

" 'In considering a petition pursuant to [section 122—2.1 of the

Act], the [trial] court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding[,] and any transcripts of such proceeding.' 725 ILCS 5/122—2.1(c) (West 2000). The court should examine those records to determine whether the allegations are positively rebutted by the record. That determination will assist the court in resolving the issue as to whether the petition is frivolous or patently without merit. *People v. Smith*, 326 Ill. App. 3d 831, 840, 761 N.E.2d 306, 315 (2001)."

On appeal from a first-stage dismissal, this court reviews *de novo* the trial court's decision. *Edwards*, 197 Ill. 2d at 247, 757 N.E.2d at 447.

## B. Defendant's Claim That His Postconviction Petition Stated the Gist of a Claim That He Was Unfit To Plead Guilty

Defendant first argues that the trial court erred by summarily dismissing his postconviction petition because it stated the gist of a constitutional claim that he was unfit to plead guilty. Specifically, he contends that his low IQ and borderline mental retardation, along with his untreated mental illnesses, raised a *bona fide* doubt of his fitness to plead guilty. We disagree.

■ The due-process clause of the United States Constitution (U.S. Const., amend. XIV) prohibits the conviction and sentencing of a person who is incompetent to stand trial. *Drope v. Missouri*, 420 U.S. 162, 172, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 904 (1975); *People v. Johnson*, 206 Ill. 2d 348, 361, 794 N.E.2d 294, 303 (2002). Illinois's statutory scheme has been held to adequately protect a defendant's due-process right to be prosecuted only when fit to stand trial. *People v. Mitchell*, 189 Ill. 2d 312, 328-29, 727 N.E.2d 254, 265 (2000). A defendant is presumed to be fit to stand trial, plead guilty, and be sentenced. 725 ILCS 5/104—10 (West 1996). When a *bona fide* doubt of the defendant's fitness exists, the trial court must order a fitness hearing so that the question of fitness may be resolved before the matter proceeds any further. A defendant is fit to plead guilty, stand trial, or be sentenced if he is able to understand the nature and purpose of the proceedings against him or to assist in his defense. *Johnson*, 206 Ill. 2d at 361-62, 794 N.E.2d at 303. In general, limited intellectual ability—without more—does not render a defendant unfit. *People v. Shanklin*, 351 Ill. App. 3d 303, 306, 814 N.E.2d 139, 143 (2004).

■ In this case, none of the attachments to defendant's postconviction petition supported its allegations that he had a low IQ and was borderline mentally retarded or suffered from untreated mental illnesses that rendered him unfit, as required by section 122—2 of the Act (725 ILCS 5/122—2 (West 2004)). See *People v. Collins*, 202 Ill. 2d

59, 67, 782 N.E.2d 195, 199 (2002) (the purpose of section 122—2's requirement that the petition have attached thereto documents "supporting its allegations" is to show that "the verified allegations are capable of objective or independent corroboration" (emphasis omitted)).

First, none of the attachments to defendant's petition supported the allegation that he had subaverage intellectual ability. The mere fact that defendant had mostly failing grades in high school between 1982 and 1986 does not establish that he had a low IQ or was mentally retarded. As the State points out, defendant's poor school performance could be explained by defendant's frequent absences from school.

In addition, none of the attachments to defendant's postconviction petition supported its allegation that he suffered from untreated mental illnesses *that rendered him unfit to plead guilty.* Instead, the October 1997 Stateville mental-health evaluation indicated that (1) defendant was alert and oriented with a "logical and goal[-]oriented" thought process; (2) his "[m]emory for immediate, recent[,] and remote events [was] unimpaired"; (3) he had a "long[-]established pattern of habitual behavior through which he copes with stress through acting out violently"; and (4) although he had previously complained of hearing a voice "from inside his head," he did not currently have that symptom. In addition, the February 1998 Menard psychiatric-discharge summary revealed that defendant (1) "was not typically mentally ill but had [a] long history of polysubstance dependence"; (2) was "alert and oriented to time, place[,] and person" but he was "trying to convey *** that he was paranoid and delusional"; and (3) had an antisocial and aggressive personality disorder, which did not require psychotropic medication. A March 1998 mental-health evaluation indicated that defendant had been diagnosed with intermittent explosive behavior and antisocial personality disorder. Finally, a May 1998 mental-health evaluation indicated that defendant (1) showed no evidence of delusions, hallucinations, or dissociative symptoms and (2) had been diagnosed with "probable rage episode" and probable antisocial disorder. None of the attachments even suggested that defendant was unfit to plead guilty—with or without being administered psychotropic medications.

Taking as true the allegations in defendant's petition that were supported by attachments—namely, that (1) defendant had been diagnosed with several mental-health problems (intermittent explosive behavior, antisocial and aggressive personality disorder, "probable rage episode," and polysubstance dependence) and (2) at the time of his guilty plea, defendant was not taking any psychotropic medications—these allegations do not necessarily establish that defendant

was unfit at the time he pleaded guilty. See *People v. Harris*, 206 Ill. 2d 293, 305, 794 N.E.2d 181, 190 (2002) (the mere fact that a defendant suffers from mental impairments does not necessarily establish that the defendant was unfit to stand trial or plead guilty); *People v. Easley*, 192 Ill. 2d 307, 322, 736 N.E.2d 975, 986-88 (2000) (rejecting a defendant's claim that his mental illness raised a *bona fide* doubt of unfitness despite the fact that the defendant had "long-standing mental problems at the time of trial that affected his ability to understand written and oral instructions" and sometimes suffered from "episodic breaks with reality"). The issue is whether defendant could understand the proceedings and cooperate with counsel. In particular, "[f]itness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas." *Easley*, 192 Ill. 2d at 320, 736 N.E.2d at 986.

In this case, the record positively rebuts defendant's claim that he was unfit to plead guilty. The record clearly shows that defendant understood the nature and purpose of the proceedings. The trial court thoroughly explained to defendant the charges against him, the possible penalties, the rights he was giving up by pleading guilty, and the terms of his negotiated plea agreement. Following all of these admonishments, defendant informed the court that he understood them. In addition, defendant did not exhibit any irrational, belligerent, or odd behavior in court. Further, the record shows that defendant participated in the proceedings and communicated and conferred with his counsel. Defendant's decision to plead guilty was contingent on the State recommending certain sentences, and he informed the court that he had signed the plea agreements of his own free will. We thus conclude that defendant failed to state the gist of a constitutional claim that he was unfit to plead guilty.

In so concluding, we note that our decision in *Shanklin*, 351 Ill. App. 3d 303, 814 N.E.2d 139, which is the primary authority upon which defendant relies, does not require a different result. In that case, the defendant pleaded guilty to attempt (murder) in the middle of a bench trial. Included in the presentence investigation report was information that (1) the defendant had been hospitalized three times for mental-health problems and (2) tests conducted during the hospital stays indicated that the defendant was mildly mentally retarded. The defendant later filed a postconviction petition, alleging, in part, that he was unfit or incompetent when he entered his guilty plea. *Shanklin*, 351 Ill. App. 3d at 304-05, 814 N.E.2d at 141-42. The defendant supported his petition with copies of a psychological evaluation from a hospital that indicated, in pertinent part, the following: (1) the defendant had been admitted to Hartgove Hospital on three separate

occasions when he was 15 or 16 years old; (2) he was seen for violent and disruptive behavior and assessed by psychiatric and social-work staff; and (3) defendant had a low IQ in the mildly mentally retarded range and had difficulty receiving and retaining verbal information. *Shanklin,* 351 Ill. App. 3d at 306, 814 N.E.2d at 143. The trial court later summarily dismissed the defendant's petition. *Shanklin,* 351 Ill. App. 3d at 305, 814 N.E.2d at 142.

The defendant appealed, and this court reversed the trial court's summary dismissal of his postconviction petition. We concluded that at sentencing (based on the information in the presentence investigation report), the trial court should have been put on notice that "there was either a *bona fide* doubt of defendant's fitness to enter his guilty plea or at least a serious question as to his ability to comprehend what he was being asked." *Shanklin,* 351 Ill. App. 3d at 308, 814 N.E.2d at 144. We thus further concluded that the trial court should have conducted a fitness hearing. *Shanklin,* 351 Ill. App. 3d at 308, 814 N.E.2d at 144. In so concluding, we noted that the defendant's hospital information indicated that (1) the defendant's mental-health professionals had made a clinical judgment that the defendant had significant problems in his verbal learning skills and an IQ in the mildly mentally retarded range and (2) the defendant "may not have been able to fully comprehend what was being verbally communicated to him either by counsel or the trial court as to the consequences of a guilty plea." *Shanklin,* 351 Ill. App. 3d at 306, 814 N.E.2d at 143.

We adhere to *Shanklin* but emphasize that whether a *bona fide* doubt of a defendant's fitness exists involves a fact-specific inquiry. See *People v. Eddmonds,* 143 Ill. 2d 501, 518, 578 N.E.2d 952, 959 (1991), quoting *Drope,* 420 U.S. at 180, 43 L. Ed. 2d at 118, 95 S. Ct. at 908 (there are " 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated' "). Here, unlike in *Shanklin,* defendant's documents in support of his postconviction petition did not indicate that defendant (1) was mentally retarded, (2) had difficulty receiving and retaining verbal information, and (3) may not have been able to fully comprehend what was being verbally communicated to him regarding the consequences of a guilty plea. Instead, as discussed above, defendant's supporting documents indicated that he suffered from mental problems that manifested themselves in defendant's acting impulsively and aggressively, displaying rage, and abusing drugs. Simply put, defendant's postconviction filings fall far short of what the defendant presented in *Shanklin.*

### C. Defendant's Claim That His Postconviction Petition Stated the Gist of a Claim That He Received Ineffective Assistance of Counsel

■ Defendant also argues that the trial court erred by summarily dismissing his postconviction petition because it stated the gist of a constitutional claim that he received ineffective assistance of trial counsel. Specifically, he contends that his counsel failed to investigate his fitness to plead guilty and request a fitness hearing. We disagree.

To establish ineffective assistance of trial counsel, a defendant must prove that (1) the conduct of counsel fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant such that a reasonable probability exists that the result would have been different but for the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-68 (1984); *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004). In reviewing the effectiveness of trial counsel, this court will afford great deference to counsel's performance. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. "To establish that the failure to request a fitness hearing prejudiced a defendant within the meaning of *Strickland*, a defendant must show that facts existed at the time of trial that would have raised a *bona fide* doubt of his ability 'to understand the nature and purpose of the proceedings against him or to assist in his defense.'" *Harris*, 206 Ill. 2d at 304, 794 N.E.2d at 189, quoting 725 ILCS 5/104—10 (West 1998).

Defendant's postconviction petition did not allege that he told his trial counsel about his mental problems or his lack of treatment. Instead, he alleged that counsel should have taken the initiative and asked him if he was "mentally ill or under any psychiatric care." The record belies defendant's allegation because defendant gave no indication that his judgment was impaired or he did not understand the proceedings. Nor did any documents then before counsel suggest that defendant could not fully comprehend the proceedings. Thus, defendant has failed to state the gist of a meritorious claim that his counsel's performance fell below an objective standard of reasonableness. In addition, because neither the record nor defendant's postconviction filings support his claim that facts existed at the time of his guilty plea that would have raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings against him or to assist in his defense, defendant has failed to state the gist of a meritorious claim that counsel's failure to investigate his fitness and request a fitness hearing prejudiced him. Accordingly, we conclude that (1) defendant has failed to state the gist of a constitutional claim

that he received ineffective assistance of counsel and (2) the trial court did not err by summarily dismissing defendant's postconviction petition.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON and KNECHT, JJ., concur.