2020 IL App (1st) 171141-U
No. 1-17-1141
Order filed November 9, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 11194 |
| | ) | |
| ANTHONY NANCE, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the trial court's summary dismissal of defendant's postconviction petition where he stated an arguably meritorious claim of actual innocence based on newly discovered evidence.

¶ 2    Anthony Nance appeals the summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act. He argues that the trial court erroneously dismissed his petition where he stated arguably meritorious claims of actual innocence and ineffective assistance of trial counsel for failing to call an alibi witness.

¶ 3     We reverse and remand for further proceedings under the Act. We find that by presenting a potential witness who averred that her uncle and his friend, and not Nance, shot at Daniel, Jr., Nance has satisfied the low threshold for first stage proceedings and raises the gist of a claim of actual innocence

¶ 4                                    Background

¶ 5     Nance and codefendant Brian Thompson, charged for a shooting that occurred on March 26, 2010, were tried in separate but simultaneous jury trials. A jury convicted Nance of first degree murder for the shooting death of Daniel Crockett, Jr. and attempted first degree murder for shooting Joshua Evans. Nance was sentenced to a total of 60 years' imprisonment. We recite the facts, as set out in Nance's direct appeal (*People v. Nance*, 2016 IL App (1st) 140649-U), to the extent necessary to our disposition. (Thompson is not a party to this appeal.)

¶ 6      At trial, Colleen Crockett testified that on March 26, 2010, she was living with her husband, Daniel Crockett, Sr., her sons, Daniel Crockett, Jr. and Ryheam Crockett, and her nephew Joshua Evans. While seated in her car on the street next to her home, Colleen was speaking with Evans and Ryheam, who stood outside her car. Several other people from her neighborhood, including friends of Evans and Ryheam, were there. A black Audi pulled up next to Colleen's car and two men emerged. She saw the men's faces, but had never seen them before. Colleen heard gunshots and then heard Evans yell that he had been shot. She saw one of the men shooting. The two men got back into the Audi and drove away. As Colleen drove Evans to the hospital, she learned another person had been shot. Her son, Daniel Jr., was brought to the same hospital.

¶ 7     On April 9, Colleen identified one of the shooters in a photo array. Three days later, she identified Brian Thompson in a physical lineup as the driver of the Audi and one of the shooters.

Colleen identified Nance in a separate lineup as the other shooter. Colleen acknowledged that her family received money from the State to move out of the neighborhood after the shooting.

¶ 8    On cross-examination, Colleen testified the shooting was unexpected and happened quickly. She could not remember whether the Audi's windows were tinted or whether she heard tires screeching. Colleen had described the shooters to police as black men between 20 and 30 years old but could not describe their heights, facial hair, or clothing.

¶ 9    Joshua Evans testified that he was 16 years old at the time of the shooting. That day, he was speaking with Colleen outside their house while Ryheam was on the sidewalk. Evans heard tires screech from a nearby alley and a black Audi with three people inside pulled up in front of Colleen's car. Evans recognized Thompson and Nance from the neighborhood but did not know their full names. Thompson got out of the driver's side, and Nance emerged from the passenger's side. Nance pointed a gun at Evans and started shooting; Thompson shot in the opposite direction. Evans ran towards his house and saw Daniel Jr. also run. When Evans realized he had been shot in the leg, he called for help.

¶ 10    Evans was "kind of" afraid of the shooters. On April 12, 2010, he viewed a physical lineup and identified Thompson as the man who got out of the driver's side of the Audi and began shooting. On April 28, 2010, Evans identified a photograph of Nance. A few weeks later, in a physical lineup, he identified Nance as the person who shot at him.

¶ 11    On cross-examination, Evans testified he had never seen the Audi before. Nance wore a red jacket, but Evans did not recall whether he informed the police of that. Evans refused to cooperate with police at the hospital because he had asked an officer whether Daniel Jr. was okay and the officer responded that he did not care.

¶ 12     Ryheam Crockett testified that he was talking to Colleen, who was sitting in her car. A black Audi parked nearby. Ryheam recognized Nance, whom he knew as "Ant," in the passenger seat. He also recognized Thompson, whom he knew as "Brian," in the driver's seat. Ryheam did not get along with either Ant or Brian. He started running when he saw Nance fire a gun toward a nearby alley, and Thompson fire towards the house. When Ryheam circled back to the house, he saw Colleen and Daniel Sr. putting Evans in the car, and Daniel Jr. on the ground. Ryheam did not tell the police that he knew the shooters. On March 28 or 29, he spoke on the phone with Daniel Sr., who wanted him to cooperate with police and identify the shooters. Ryheam told Daniel Sr. that "Ant" and "Brian" were the shooters.

¶ 13     On April 9, 2010, Ryheam identified Thompson and Nance in a photo array as the shooters. He had not told police this information earlier because he was afraid of Nance and Thompson as he and his family remained in their house. Three days later, the Crocketts moved, and Ryheam identified Thompson in a physical lineup. He identified Nance in a lineup on May 20. On cross-examination, Ryheam acknowledged the shooting happened quickly. He could not recall the color of the guns. He spoke with his family after the shooting and told them what he had seen.

¶ 14     Chicago police detective Roberto Garcia testified that he met with Daniel Sr. on March 29. Garcia asked him to call Ryheam and encourage him to cooperate with the police. Based on the information he obtained from Daniel Sr., Garcia compiled a photo array with Nance's and Thompson's pictures.

¶ 15     Abshalom Timms testified that, at 7 p.m. on March 26, 2010, he was at a nearby park. He saw a black Audi and two other cars driving the wrong way down an alley. Two men poured gasoline on the Audi and lit it on fire. Timms spoke with police but could not identify the men.

¶ 16   Lamar Booth lived across the street from the Crocketts. He testified he heard gunshots and saw a black Audi parked near the Crockett house. He saw two men standing near the Audi and facing the Crockett house but did not see their faces.

¶ 17   Police technicians recovered two different types of cartridge casings in the street outside the house. Testing of the cartridges revealed that at least two guns were used in the shooting. A burnt temporary license plate police recovered from the Audi belonged to a different vehicle.

¶ 18   The jury found Nance guilty of first degree murder and attempted first degree murder, and the trial court sentenced him to a total of 60 years of imprisonment. We affirmed on direct appeal but ordered Nance's mittimus be corrected. *Nance*, 2016 IL App (1st) 140649-U.

¶ 19   Nance filed a *pro se* petition for postconviction relief under the Post-Conviction Hearing Act, 725 ILCS 5/122-1 et seq. (West 2016), arguing, among other issues, "factual innocence" and ineffective assistance of counsel for failure to call an alibi witness. He argued he has obtained newly discovered evidence from eyewitness "Kelsey Garner," an "unknown witness who was not available and or uncooperative at the time of trial," which he "believes" "to be a colorable claim of factual innocence." (In his petition, Nance refers to this witness as "Garner." The affidavit states "[t]he undersigned Kelsey Gardner" while the signature reads "Kelsey Garner." For consistency and clarity, we use the spelling of the signature and refer to this witness as Garner.)

¶ 20    Nance alleged "no exercise of due diligence could have recovered these facts at any earlier time" because Garner was not known to him. Further, Garner's testimony was reliable "and acquired prior to and after trial which would have changed the outcome of the trial." He then stated he was "not alleging 'actual innocence' but believes he has demonst- [*sic*] cause and actual prejudice." Nance's petition has no page numbers and certain pages appear to have been written

by different individuals. Based on the way the petition is written and compiled in the record, is it unclear whether some pages are missing or if it is out of order.

¶ 21    With respect to trial counsel's ineffectiveness, Nance alleged that trial counsel knew Nance turned himself into police because "he was somewhere else at the time of the incident and that [trial counsel] should investigate and or speak to Steven Smith [Fraizer] who would testify they were together on the night in question" from 3 to 8:30 p.m. He alleged he spoke with trial counsel multiple times regarding using Fraizer as an alibi witness and there was "no tactical or strategical [*sic*] reason" for failing to call Fraizer, "especially when the alibi witness was available and instructed not to be in court and wait in court hallway but was never called."

¶ 22    In support of his petition, Nance attached affidavits from Thompson, Fraizer, and Garner. Thompson averred he was not at the scene of the shooting between 5 and 7 p.m. on the March 26, 2010, "in the individual company of either [Nance] or Monticello Scott." He did not know whether Nance or Scott were near the scene.

¶ 23    Garner averred that, on March 26, 2010, between 5:30 and 6 p.m., as she was going to a convenience store on Ogden and St. Louis Avenues, she noticed a black Audi, a beige Buick sedan, and three other vehicles. She saw her uncle Jonathan Hayes and his friend, Johnny Henderson, getting out of the Audi. Both men were "equipped with handguns." Garner returned to her home "trying to go unnoticed by [her] uncle and his friend." She saw Hayes and Henderson pursuing Crockett on foot through an alley and firing the guns. She hid behind a car to remain unseen. Garner never spoke to anyone about the shooting because she feared for her safety. She had since learned that Nance and another individual had been charged. She did not know Nance, but had seen him "on a few occasions." Garner averred that Nance "did not commit the crime that took

place on March 26, 2010 which resulted in the death of [Crockett]." If subpoenaed she would testify to the facts alleged in her affidavit.

¶ 24    Fraizer averred that, on March 26, 2010, he was a friend's house on South Sawyer Avenue with Nance for a family gathering between the hours of 3 and 9 p.m. Frazier dropped Nance off at his residence around 9:15 p.m. Frazier spoke with Nance's trial counsel and informed him he was willing to testify to "this exact statement." He was present in court during Nance's trial, but was not called to testify.

¶ 25    Nance also provided his own affidavit, in which he averred that, between 5 and 7 p.m. on March 26, 2010, he was "not at or near the location of 1900 South St. Louis in the individual company of either Brian Thompson or Monticello Scott." In an unnotarized "affidavit," Nance additionally stated that he turned himself into police after hearing they were looking for him. Nance told trial counsel he was with his "friend" on the day of the shooting and advised counsel to speak with him. Counsel told Nance he "would and did" subpoena his friend, who "was at the court building ready to testify but were never called."

¶ 26    The trial court summarily dismissed Nance's petition. In pertinent part, the trial court found Garner's affidavit failed to support a claim of actual innocence. Although it found the affidavit was newly discovered and noncumulative, the trial court determined it was not material to Nance's guilt or innocence or so conclusive as to probably change the result on retrial. The court found that, although Garner claimed she saw Henderson and Hayes pursue Daniel Jr. while firing guns, she also stated that she hid once the shooting began and did not provide any information on who ultimately shot Daniel Jr. and Evans. The trial court held that Garner's evidence did not contradict or outweigh the overwhelming evidence presented against Nance at trial.

¶ 27    Regarding Nance's claim of counsel's ineffectiveness for failing to call Fraizer as an alibi witness, the trial court found counsel knew of Fraizer and the decision was an appropriate exercise of trial strategy. Further, Nance failed to demonstrate the requisite prejudice because of overwhelming evidence of his guilt, and Fraizer's "vague testimony that he was with [Nance] at a friend's residence all day [was] insufficient to merit relief."

¶ 28    On appeal, Nance claims his petition makes an arguably meritorious claim of actual innocence and the gist of a claim of ineffective assistance of trial counsel.

¶ 29                                        Analysis

¶ 30    The Post-Conviction Hearing Act sets forth a three-stage process as a means for criminal defendants to challenge their convictions based on constitutional violations. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). Nance's petition for postconviction relief was summarily dismissed at the first stage, where the trial court independently reviews the petition, taking the allegations as true, and determines whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2016). A petition may be summarily dismissed as "frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009); *People v. Tate*, 2012 IL 112214, ¶ 9. A claim has no arguable basis when it is based on an indisputably meritless legal theory, for example, a legal theory completely contradicted by the record, or a fanciful or delusional factual allegation. *People v. Brown*, 236 Ill. 2d 175, 185 (2010).

¶ 31    To survive the first stage, a petition need only present the gist of a constitutional claim, a low threshold. *People v. Allen*, 2015 IL 113135, ¶ 24. Only limited detail is necessary for the petition to proceed beyond the first stage of postconviction review, as opposed to setting forth a

claim in its entirety. *Hodges*, 234 Ill. 2d at 9; *People v. Williams*, 364 Ill. App. 3d 1017, 1022 (2006). Despite this low threshold, a defendant must provide factual support for his or her claims and t show a sufficient factual basis to demonstrate that the allegations in the petition are "capable of objective or independent corroboration." *People v. Collins*, 202 Ill. 2d 59, 67 (2002). We review the summary dismissal of a postconviction petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 32     Nance first contends that he presented an arguably meritorious actual innocence claim based on newly discovered evidence from Garner's affidavit.

¶ 33     The wrongful conviction of an innocent person violates due process under the Illinois Constitution and, thus, a freestanding claim of actual innocence is cognizable under the Act "and should be resolved as any other brought under the Act." See *People v. Washington*, 171 Ill. 2d 475, 489 (1996). To succeed on a claim of actual innocence, a petitioner presents evidence that is (i) newly discovered, (ii) material and noncumulative, and (iii) of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *Washington*, 171 Ill. 2d at 489).

¶ 34     Newly discovered evidence involves evidence that was discovered after trial that could not have been discovered sooner through the exercise of due diligence. *People v. Robinson*, 2020 IL 123849, ¶ 47. Material evidence comprises relevant and probative evidence of the defendant's innocence. *Id*. Noncumulative evidence adds to the information before the fact finder at trial. *Id*. The conclusive character element refers to evidence that, when considered together with the trial evidence, would probably lead to a different result on retrial. *Robinson*, 2020 IL 123849, ¶ 47 (citing *Coleman*, 2013 IL 113307, ¶ 96). The conclusive character of the new evidence constitutes the most important element of an actual innocence claim. *Id*.

¶ 35    Garner's proposed testimony is new because Nance was unaware that she observed the shooting and she did not come forward until years after trial. So Nance could not have discovered her sooner. Garner's proposed testimony is material and noncumulative because she identifies someone other than Nance as the shooter and such information was not presented to the jury at trial.

¶ 36    With regard to the conclusive character element, ultimately, we ask "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 49 (citing *Coleman*, 2013 IL 113307, ¶ 97). The new evidence need not be "entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 37    Taking Garner's averments as true, given that credibility determinations may not be made until third-stage evidentiary hearings (*id.* ¶ 42), we find Nance made an arguable showing that Garner's proposed testimony would probably lead to a different result on retrial. Garner identifies her uncle and his friend as the shooters who emerged from the black Audi and pursued Daniel Jr. through an alley firing guns. She also avers that Nance "did not commit the crime" that resulted in Daniel Jr.'s death, that is, Nance was not one of the shooters. Although Ryheam, Colleen, and Evans identified Nance as one of the shooters, Garner's proposed testimony contradicts those identifications. Where, as here, newly discovered evidence is both exonerating and contradicts a State's witness, it is capable of producing a different outcome on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009) (identification of different offender presents evidence that facts should be

analyzed more closely to determine defendant's guilt or innocence); see also *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 (same).

¶ 38    The new evidence in Garner's affidavit is not positively rebutted by the record. "[T]he existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Robinson*, 2020 IL 123849, ¶ 60. To be positively rebutted, it must be "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. Here, the record does not affirmatively demonstrate that a trier of fact could never accept the veracity of Garner's statements.

¶ 39    Thus, we find Nance satisfied the low threshold applicable to first stage proceedings and poses the gist of a claim of actual innocence by presenting a potential witness who averred that her uncle and his friend, and not Nance, shot at Daniel, Jr. See *Robinson*, 2020 IL 123849, ¶ 73 (in context of motion for leave to file successive postconviction petition alleging actual innocence, finding that newly discovered eyewitness affidavit that contradicted, but was not positively rebutted by, State's eyewitnesses regarding identification of offender was " reason to allow petitioner to proceed, with counsel, on his colorable claim of actual innocence").

¶ 40    In light of this conclusion, we need not address Nance's ineffective assistance of counsel claim. See *People v. Rivera*, 198 Ill. 2d 364, 370-71 (2001) (partial summary dismissals are not permitted by Post-Conviction Hearing Act).

¶ 41    Reversed and remanded.