THIRD DIVISION
June 25, 2008

No. 1-05-3656

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| SAMIR ITANI, | ) | Honorable |
| | ) | Michael P. Toomin, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Defendant Samir Itani appeals from an order of the circuit court denying his supplemental motion to withdraw his plea of guilty but mentally ill. On appeal, defendant contends that the circuit court erred in denying his motion where: (1) the manifest weight of the evidence showed that defendant was unfit to waive his right to trial and enter a plea of guilty but mentally ill, where he had organic brain damage resulting in permanent confusion; (2) the manifest weight of the evidence showed that defendant did not voluntarily plead guilty but based his decision on the mistaken belief that he would be sent to a hospital in exchange for his plea; (3) defendant was denied a fair hearing; and (4) the circuit court improperly excluded testimony regarding defendant's susceptibility to outside influence to plead guilty. For the following reasons, we affirm.

## I.  BACKGROUND

Defendant was charged with first degree murder for the fatal shooting of David Anderson, which occurred on May 7, 2000, near 4238 South Mozart in Chicago, Illinois.  On July 10, 2001, the Public Defender of Cook County was appointed and a plea of not guilty was entered.

On February 26, 2002, defense counsel, Assistant Public Defender Dayna Woodbury, requested that defendant be evaluated for fitness to stand trial, sanity, and ability to understand his Miranda rights.  On March 26, 2002, Dr. Jennifer Foran from Forensic Clinical Services reported that defendant was mentally fit to stand trial with medication, in that he understood the nature and purpose of the proceedings against him and was able, should he choose so, to assist in his own defense.  However, due to defendant's lack of cooperation during the interview, Dr. Foran was unable to formulate opinions as to the issues of sanity and defendant's ability to understand his Miranda rights.

Defense counsel then requested a second opinion from a psychologist fluent in Arabic, defendant's first language.  Dr. Juliet Dinkha was retained to conduct a psychotherapist evaluation of defendant in Arabic.  On December 4, 2002, Dr. Dinkha provided a report in which she concluded that defendant was mentally unfit to stand trial and unable to understand his Miranda rights.  Upon learning that Dr. Foran was no longer at Forensic Clinical Services, the State sought a current evaluation.  On April 22, 2003, Dr. Fidel Echevarria reported that he examined defendant and determined that defendant remained fit to stand trial with medication.  During a fitness hearing on June 16, 2003, defendant called Dr. Dinkha as a witness.  Dr. Dinkha testified that she was not licensed, had never testified as an expert witness on a defendant's

fitness, and did not know the standards to determine fitness. The circuit court found that Dr. Dinkha was not an expert witness able to provide a fitness opinion, but permitted Dr. Dinkha to testify as to her observations of defendant. Dr. Echevarria also testified regarding his examination of defendant and finding of fitness with medication. Following the testimony, the circuit court found that defendant was fit to stand trial.

The circuit court subsequently set a jury trial date for October 14, 2003, and in the intervening period, the State requested a reevaluation of defendant. Dr. Echevarria reported again that defendant was fit to stand trial with medication, sane, and had the ability to understand his Miranda rights. At a hearing on October 20, 2003, the State conveyed an offer to defense counsel that upon a plea of guilty but mentally ill to first degree murder, defendant would receive a determinate sentence of 30 years. Following discussions with defense counsel and his brother and sister-in-law, defendant entered the plea of guilty but mentally ill and was sentenced to 30 years.

On November 19, 2003, defendant filed a *pro se* motion to withdraw his guilty plea and vacate his sentence. Defense counsel was appointed and, on April 2, 2004, filed a supplemental motion to withdraw defendant's guilty plea. In defendant's supplemental motion, defendant alleged, *inter alia*, that his plea was not entered knowingly, intelligently and voluntarily where: (1) defendant lacked the mental capacity and academic skills to comprehend the plea process and the relinquishment of his constitutional rights; (2) defendant lacked the emotional stability to withstand the pressure from family members urging him to plead guilty; (3) defendant mistakenly thought that he would receive psychiatric hospitalization in exchange for his plea; and (4)

defendant was denied effective assistance of trial counsel where counsel failed to obtain an updated neurological evaluation of defendant's cognitive and intellectual functioning.

On August 5, 2005, the circuit court conducted a hearing on defendant's supplemental motion to withdraw his guilty plea. As a preliminary matter, the court first considered whether defendant was fit to proceed on his motion to withdraw his guilty plea, pursuant to this court's holding in People v. Roby, 356 Ill. App. 3d 567 (2005). The parties stipulated that, if called to testify, Dr. Susan Nowak would testify that she evaluated defendant on July 14, 2005, to determine whether he was fit to proceed on his motion to withdraw his guilty plea. Dr. Nowak would testify that she performed a forensic psychiatric evaluation of defendant, which included reviewing relevant police, hospital, psychiatric, and psychological reports. Dr. Nowak would testify that it was her opinion, to a reasonable degree of medical and psychiatric certainty, that defendant was fit to proceed on his motion. Dr. Nowak would also testify that the basis of her opinion was that defendant had a basic knowledge of the court system, the reasons he was asking to vacate his plea, and the possible consequence of receiving a harsher sentence should his motion be granted. Dr. Nowak would further testify that, due to defendant's brain deficits and potential for emotional disruption, he should be provided with an Arabic interpreter at the hearing on his motion.

The parties also stipulated that, if called to testify, Dr. Matthew Markos would testify that, on May 26, 2005, he performed a forensic psychiatric evaluation of defendant, which included a review of relevant police, hospital, psychiatric, and psychological records. Dr. Markos would testify that it was his opinion, to a reasonable degree of medical and psychiatric

1-05-3656

certainty, that defendant was presently fit with medications to proceed on his motion to withdraw his guilty plea. Dr. Markos would further testify that the basis of his opinion was that defendant was cognizant of the charge, understood the nature and purpose of the court proceedings, and showed the ability to cooperate with counsel in his defense. Based on these stipulations, the circuit court found defendant mentally fit to proceed on his motion to withdraw his plea of guilty.

At the hearing, defendant's sister, Rouhaifa Itani-Zamora testified on defendant's behalf. Rouhaifa testified that she had lived with defendant in their parents' home for 22 years. Rouhaifa testified that in 1991, defendant was in a car accident that left him in a coma. After the accident, defendant had to be cared for by his family because he had no memory. Rouhaifa testified that defendant was like a three-year old child because he could not make decisions and he had to be taught right from wrong, to write his name, to bathe, and to learn colors. Rouhaifa testified that after defendant was released from the hospital, he had mood swings, anger issues and believed things happened that never occurred.

Rouhaifa testified that after 1995, defendant would become more aggravated at home and sneak out of the house. Rouhaifa acknowledged that between 1995 and defendant's arrest in this case, defendant had been arrested 16 times. Defendant only kept jobs for a week or two and he was only able to get jobs from family members. Rouhaifa testified that she was aware that defendant had a "King" tattoo on his left arm but was not aware that he was a member of the Latin Kings gang. Rouhaifa also acknowledged that, in 2002, she had been convicted of felony conspiracy to import 500 grams or more of amphetamines.

Rouhaifa testified that in the spring 2001, defendant was in the hospital for spleen

removal and mental status. Defendant was given medication so that he would not suffer fits of anger and would remain calm at night. Rouhaifa testified that defendant was arrested after he was released from the hospital and police officers denied her access to defendant. Defendant's family gave his attorney copies of defendant's hospital records, psychiatric records, deportation papers and prescription information.

Dr. Susan Nowak testified that she was retained by defense counsel to perform a forensic evaluation of defendant's capacity to plead guilty but mentally ill. Dr. Nowak reviewed defendant's arrest record and noticed a division between the behaviors leading to defendant's arrest before his head injury, and defendant's behavior after his head injury. Prior to his head injury, defendant was arrested for two aggravated assaults, three batteries, one aggravated battery with great bodily harm, one attempted first degree murder, possession of cocaine, and damaging property. Dr. Nowak testified that after defendant's head injury, which resulted from defendant crashing a stolen vehicle, defendant was arrested for "trivial things," including theft, possession of a stolen motor vehicle, six cannabis charges, cocaine possession, six disorderly conduct charges, battery, possession of a firearm without a valid FOID, and the current murder charge. Dr. Nowak testified that these arrests showed a change in personality and that defendant became more impulsive with an inability to control his aggressive feelings.

Dr. Nowak testified that she also reviewed the records relating to defendant's head injury. Defendant suffered a "very severe" closed-head injury and was comatose for some time. Defendant had intracranial bleeding and damage in four areas of his brain. Dr. Nowak testified that the areas of defendant's brain injury were "completely concordant" with the types of

neuropsychiatric deficits shown in defendant's testing, which related to defendant's memory, attention span, and executive functioning. Dr. Nowak explained that executive functioning relates to the ability to control one's impulses and emotions.

Dr. Nowak conducted a three-hour interview with defendant, in defense counsel's presence. Dr. Nowak made numerous attempts to instruct defendant about the court proceedings and found that defendant had very basic or limited understanding of the proceedings. Defendant was able to say that the judge makes the decisions, his lawyer defends him, and the attorney for the State was trying to put him in jail. Dr. Nowak testified that defendant was unable to understand the considerations in order to plead or withdraw his pleas. As the interview went on, defendant became irritable and stressed by the material. Defendant attempted to end the evaluations four or five times, but Dr. Nowak and defense counsel convinced defendant to continue the interview.

Dr. Nowak testified that defendant responded to "contextual cuing," in which Dr. Nowak attempted to discover what defendant remembered about the circumstances leading up to his arrest. Dr. Nowak testified that defendant became paranoid and confused. Dr. Nowak diagnosed defendant with psychotic disorder and dementia due to brain injury, which is the loss of ability to function. Dr. Nowak found that defendant had problems with memory, attention, concentration and auditory processing. Dr. Nowak was not sure if defendant met the criteria anymore for antisocial personality disorder and, therefore, diagnosed defendant as "status, post anti-social disorder."

Dr. Nowak testified that her opinion, to a reasonable degree of medical and psychiatric

certainty, was that defendant did not understand the nature of the plea process in any functional way and was not competent to plead. Dr. Nowak testified that defendant was unable to evaluate his chances, examine the State's evidence, and compare strategy for trial versus pleading. Defendant understood the outcome of going home if he was not convicted, but defendant was intolerant of continuing discussions regarding trial strategy. Dr. Nowak testified that defendant did not understand the rights he would be giving up by entering a plea, including the right to a jury trial, the right to confront his accuser, and the right not to incriminate himself. Dr. Nowak testified that the most significant reason that defendant plead guilty but mentally ill was that his family told defendant he would be going to the hospital. Dr. Nowak acknowledged that the transcript from defendant's guilty plea was "very detailed, and everything was well explained to him."

Dr. Nowak testified that it was not common for her to conduct an evaluation with counsel present and that it is not a common practice in the scientific community. Dr. Nowak testified that defense counsel was active in defendant's evaluation and participated in attempting to educate defendant on his rights and trial strategy. Dr. Nowak further testified that during her last interview with defendant, defendant recalled details about the murder in question but denied being the shooter. Defendant also admitted that he was a member of the Latin Kings gang.

Vernon Winstead testified that, in 1990, he was assigned as defendant's probation officer after defendant received two years of probation. Winstead testified that he was aware that defendant had some mental complications toward the end of defendant's probation. Defendant's probation terminated in 1992, but defendant continued to report three or four times after his

probation terminated. Winstead testified that on those occasions, defendant would sign in and wait for Winstead. Winstead informed defendant that he was no longer on probation, but defendant reported two or three more times. Winstead testified that defendant would come to Winstead's office by himself. Winstead also testified that defendant spoke to him in English and he had no difficulty communicating with defendant.

Oussama Itani, defendant's brother, testified that on October 20, 2003, he and his ex-wife, Colleen Itani, met with defense counsel outside the courtroom. Defense counsel took Oussama and Colleen into the back and told them that defendant had two choices: either take 30 years and go to the hospital where his family could visit him, or receive 45 years to life in prison. Oussama testified that he told defendant to take the 30 year plea so that his family could see, feel, and touch him in the hospital. Oussama testified that when he told defendant about the offer, defendant appeared sad and angry. Oussama denied discussing the offer with defense counsel and denied receiving any police reports from defense counsel. Oussama testified that defense counsel did instruct him that defendant's treatment in a hospital was dependent on the determination of doctors, and if the doctors determined that defendant did not have mental problems defendant would be placed in the general prison population. Oussama testified that he thought that the doctors had already determined that defendant should be treated in the hospital before defendant pled guilty but mentally ill.

Colleen Itani testified to a similar version of events as Oussama. Colleen testified that defense counsel expressed her sympathy and stated that defendant was facing 45 years to life in prison based on evidence stacked against him, so "the best thing for [them] to do as his family"

was to convince defendant to plead guilty and serve the years in a mental institution. Colleen testified that after she and Oussama spoke with defendant, defendant became upset, confused, and depressed. Colleen testified that she told defendant that defense counsel indicated that the evidence against defendant was strong. Colleen told defendant that the best thing for him to do was plead guilty so that his family could "see him in the hospital, communicate, and at least he could touch his mother." Colleen testified that defense counsel indicated that defendant would eventually be reevaluated in the hospital and if he were found fit and sane, there was a possibility that defendant would be released. Colleen testified that defendant was excited about the possibility of being released. Colleen also testified that defense counsel did not give her any paperwork, but she did think the offer of 30 or 35 years was a good deal. Colleen testified that she did not know that defendant was a Latin King gang member. However, after defendant entered his plea of guilty but mentally ill, Colleen saw defendant "turn [] towards the victim's family and [throw] the crown at them," which is the gang sign for the Latin Kings.

Dr. Sharon Coleman testified that she is a licensed clinical psychologist employed by Forensic Clinical Services. On February 13, 2004, Dr. Coleman interviewed defendant, at defense counsel's request, to evaluate defendant's memory deficits or impairment. Dr. Coleman administered the "Test of Memory Malingering" (TOMM), the "Rey 15 Items" test, and the "Repeatable Battery for the Assessment of Neuropsychological Status" (R-Band). Dr. Coleman testified that defendant's score on the TOMM test suggested that defendant might have been exaggerating or malingering some of his memory deficits. Dr. Coleman testified that defendant's score on the Rey 15 Item test corroborated that there was some exaggeration of defendant's

1-05-3656

memory deficit.

Dr. Coleman explained that the R-Band test measures several different domains of cognitive functioning, including attention, language, and delay in immediate memory. Dr. Coleman testified that the overall results of the R-Band test suggested that defendant had a severe degree of neurocognitive impairment. Dr. Coleman concluded that while defendant does suffer from memory deficit, particularly in the area of retrieval, there was a suggestion from the test that defendant was exaggerating at least some of those memory deficits. Dr. Coleman explained that "malingering" is the intentional exaggeration or false report of psychological symptoms or disorder for some secondary gain. Dr. Coleman testified that she did not believe that defendant was fully malingering, but that there was some exaggeration. Dr. Coleman also reviewed the previous reports by Forensic Clinical Services Drs. Foran and Echevarria, and observed inconsistencies in the amount of information that defendant could remember. Dr. Coleman testified that this observation corroborated her opinion that defendant was exaggerating the severity of his memory deficits.

Dr. Coleman characterized defendant's memory deficits as mild to moderate and testified that she would have to perform more in-depth testing to state how much impairment defendant had. Dr. Coleman testified that based on her testing, defendant did not seem to have a severe memory impairment. Dr. Coleman testified that she did not specifically evaluate defendant for fitness, but that the deficits noted during defendant's testing would not necessarily preclude his fitness to stand trial.

Dr. Matthew Markos testified that he is a forensic psychiatrist and employed as the

-11-

director of Forensic Clinical Services of the circuit court of Cook County. On May 18, 2005, Dr. Markos received a court order requesting an evaluation of defendant's fitness to stand trial, including defendant's fitness to withdraw his guilty plea. Dr. Markos first reviewed all of defendant's records, including police reports, grand jury transcripts, the transcript for the hearing in which defendant pled guilty but mentally ill, transcripts from defendant's fitness hearing in 2003, defendant's motion to withdraw his guilty plea, and psychiatric reports and summaries, including those from Dr. Echevarria, Dr, Foran, Dr. Nowak, and Dr. Gruenberg.

After reviewing defendant's records, Dr. Markos examined defendant on May 26, 2005. Dr. Markos noted from his review of prior examinations that defendant, who is of Lebanese descent, had an Arabic-English interpreter present at examinations. Therefore, Dr. Markos decided to have an interpreter present during his examination of defendant to make sure he was able to conduct a comprehensive examination. Dr. Markos testified that defendant was able to answer questions in English during the examination. Dr. Markos testified that the policy of the Forensic Clinical Services, and his personal policy, is that attorneys are not allowed to be present during evaluations. Dr. Markos explained that this policy ensures an independent and objective interview and permits the examiner to cultivate rapport with the individual. Dr. Markos testified that the presence of a defense attorney could create the perception that the attorney is present to defend the individual from the examiner, thereby creating an adversarial climate and not a clinical climate. Dr. Markos also testified that an attorney could directly or indirectly communicate or participate in the examination and create a coaching session instead of a clinical examination.

Dr. Markos testified that after discussing defendant's background, he asked defendant specific questions to identify the presence or absence of any mental disorder or disease. Dr. Markos testified that he was aware that defendant sustained a traumatic head injury in 1991, and Dr. Markos did not dispute defendant's prior psychiatric or neurological damage. However, Dr. Markos testified that when he examined defendant, defendant was "orientated to time, place, and, person, he did not appear to be depressed or manic, he was not anxious or agitated, he gave full cooperation, he was in touch with reality, his responses were coherent, logical and responsive to the questions put forward to him." Dr. Markos testified that there was no evidence that defendant had any thought disorder, such as delusions or abnormal beliefs. Defendant did not manifest any perceptive disorders, such as hallucinations, or any serious cognitive deficits. Dr. Markos also testified that defendant did not appear to be suicidal or homicidal.

Dr. Markos testified, with respect to the fitness criteria, that defendant was fully cognizant of the charge that he was facing and the fact that he had already pled guilty and received a 30-year sentence on a plea of guilty but mentally ill. Dr. Markos testified that defendant had satisfactory knowledge of the court proceedings and the functions of courtroom officials. Dr. Markos testified that defendant understood the roles of the judge, the prosecutor, and defense counsel, and "matters that are not known to him can be explained to him." Dr. Markos testified that defendant did not have any difficulty understanding or learning and showed the capacity to cooperate with counsel in his defense. Dr. Markos concluded that his opinion, based on a reasonable degree of medical and psychiatric certainty, was that defendant was fit to stand trial on the date Dr. Markos examined him and defendant was fit to enter or withdraw a

guilty plea.

Dr. Markos testified that on July 14, 2005, he received another court order to retroactively determine defendant's fitness, in October 2003, to enter his plea of guilty but mentally ill. Dr. Markos explained that many forensic examinations are retroactive evaluations. Dr. Markos testified that he gave the matter a lot of thought and determined that it was not necessary to examine defendant again because Dr. Markos had the necessary information to make a determination. Dr. Markos testified that he had conducted a comprehensive examination for fitness and defendant "had satisfied the fitness criteria thoroughly." Dr. Markos concluded that defendant was mentally fit to enter a plea of guilty but mentally ill on October 20, 2003.

In reaching this conclusion, Dr. Markos examined information from around the time of defendant's guilty plea to shed light on defendant's mental condition at the time. Dr. Markos testified that nothing indicated that defendant had decompensated and become unfit to enter his plea. Dr. Markos examined the psychiatric report by Dr. Echevarria in September 2003, defendant's jail records to determine whether defendant was manifesting any psychiatric symptoms, and defendant's hospital records from October 2003. Dr. Markos testified that a medication chart from September and October 2003 showed that defendant was prescribed Risperdal and Sinequan, and defendant self-reported taking his medication until October 24, 2003, which was four days after his plea. Dr. Markos also reviewed defendant's mental health evaluation from October 27, 2003, which was one week after defendant's guilty plea. This evaluation indicated that defendant was not depressed, not anxious, not psychotic, not hallucinating, and not suicidal. Following the evaluation, defendant was sent to the general

prison population, with medication.

In reaching a conclusion on defendant's fitness, Dr. Markos also reviewed defendant's comments during the sentencing hearing, including defendant's request for a lethal injection. Dr. Markos noted that defendant requested a lethal injection after his plea and sentence and the evaluation one week after his plea indicated that defendant was not suicidal. Dr. Markos found that defendant's comment was not a manifestation of suicidal ideation or depression, but was a comment stemming from discontent and pathological in origin.

Dr. Markos also noted that defendant had an awareness of the courtroom proceedings and possible legal recourse where, following his plea, defendant specifically asked the circuit court if he could appeal his case. Dr. Markos testified that defendant's *pro se* motion to withdraw his guilty plea also indicated that defendant understood court proceedings. Defendant also told Dr. Markos during the examination that defendant understood his right to withdraw his plea within 30 days. Dr. Markos also explained that the fact that defendant, prior to taking the plea, asked if he could have a 20- or 25-year sentence indicates that defendant was in touch with reality and aware of the proceedings and options available to him. Dr. Markos testified that the fact that defendant flashed a gang symbol to the victim's family at the conclusion of the plea shows a lack of remorse and antisocial personality.

Dr. Markos diagnosed defendant on Axis II as having antisocial personality disorder, which is a general enduring, stable and life-long disorder. Dr. Markos testified that the cardinal features of an antisocial disorder are that the person is against society and breaks rules or laws, and lacks remorse or any regard for other people's rights or safety. Dr. Markos also diagnosed

defendant on Axis III as post head injury secondary to car accident.

Dr. Markos disagreed that defendant was suffering from dementia due to head trauma. Dr. Markos explained that dementia is a global impairment of current intellectual or cognitive functions, which constitutes a long-term disorder of the brain with impairment in virtually all areas. Dr. Markos testified that this did not apply to defendant. Dr. Markos testified that defendant had a history of head injury and sustained neurological insult, but "today he has shown much recovery and I do not agree with the diagnosis of dementia because dementia would mean that he's presently globally impaired, and that is simply not the case."

Dr. Markos also testified that defendant did not have the medical or psychiatric symptoms of an individual with serious organic mental disorder or brain injury because those conditions are progressive. Rather, defendant had shown significant improvement since his brain injury. Dr. Markos testified that defendant might have mild cognitive deficits, but it did not preclude fitness. Defendant was able to provide a complete background history and describe recent events, including living in jail. Dr. Markos testified that defendant was clearly in touch with reality.

Dr. Markos did not make a diagnosis of malingering but noted inconsistencies in defendant's behavior during previous examinations. For example, when Dr. Foran interviewed defendant in March 2002, the interview was completely in English. However, when Dr. Echevarria interviewed defendant, the interview was entirely in Arabic. This prompted Dr. Markos to provide defendant with an interpreter, but as his examination progressed and they discussed trial and fitness issues, defendant spontaneously responded in English. Dr. Markos noted that when Dr. Gruenberg interviewed defendant, the interview was entirely in English. Dr.

Markos testified that defendant's interactions with examiners showed inconsistency and withholding information in a self-serving manner.

Dr. Linda Gruenberg testified that she is a board-certified forensic psychiatrist and was retained by the prosecution to determine whether defendant suffered any cognitive or mental impairment that would prevent defendant from knowingly, intelligently, and voluntarily entering a plea of guilty. Dr. Gruenberg first reviewed the same records as Dr. Markos and Dr. Nowak, and also spoke with officers at the jail and defendant's public defender at the plea, Dayna Woodbury.

Dr. Gruenberg testified that after reviewing the records and finding that a number of interviews with defendant had been conducted strictly in English, Dr. Gruenberg evaluated defendant without an interpreter. Dr. Gruenberg testified that she was able to communicate with defendant in English. Dr. Gruenberg testified that she does not conduct evaluations in the presence of attorneys because it could taint the interview. Dr. Gruenberg testified that she uses open-ended questions and does not rely on the technique of "cueing," which could result in the subject simply parroting back information without understanding it. Dr. Gruenberg also testified that she is concerned about the length of evaluations because it is important to avoid fatigue. Dr. Gruenberg noted that Dr. Nowak's three-hour interview with defendant was extremely long and multiple times in the report defendant was noted as being exhausted and wanting to cease the interview, but he was pushed to continue the interview.

Based on her review of the records and interview with defendant, Dr. Gruenberg concluded that defendant had the capacity and was fit to enter a guilty plea on October 20, 2003.

Dr. Gruenberg noted that during her interview with defendant, defendant was very calm, very polite, maintained good eye contact, was fairly cooperative, and participated in the evaluation. Dr. Gruenberg testified that she spoke to defendant in simple language and took her time, which defendant seemed to understand and responded to appropriately. Defendant was able to discuss his personal history and his past head injury. Defendant recalled that his head injury occurred in 1989 or 1990, that he lost his memory, and had to relearn things. Defendant was able to recall his age when he came to this country, where he came from, the number of siblings he had, and that he was an auto mechanic prior to his head injury.

Defendant also knew what he was charged with and stated that he was in a car with a gang member at the time of the shooting in this case, but that defendant himself was not a gang member. Defendant stated that he was going with the gang member to a party and the gang member shot the victim in this case. Dr. Gruenberg testified that defendant provided this account clearly, quickly, and in a very easily understandable manner. Dr. Gruenberg had noted that in the record prior to his plea, defendant had stated that he had no recollection of the shooting and was not present when it occurred. Dr. Gruenberg testified that defendant's different statements of the event suggested malingering, in that at some point, defendant had told a different type of story for his own benefit.

Dr. Gruenberg testified that defendant knew how long he had been in jail, that he had no bond, and that he described his defense attorney as the person "that would defend me so I don't go to jail." Defendant described the prosecutor as the one "who is going to lock me up" and stated that the "Judge is - - if God is everything right there, he says so, everything he say go

through, he is the higher man." Defendant understood that guilty meant "you did the crime" and go to jail, and that not guilty meant a person was innocent and could go home. Defendant stated that a plea is when a person is guilty. When asked how he decided whether to plead, defendant responded "that's when I talked to my attorney," which Dr. Gruenberg testified indicated that defendant realized it was important to consult a legal expert to discuss the status of his case and help him make decisions.

Defendant told Dr. Gruenberg that he took the plea because he thought he would go to the hospital. Defendant also stated that he entered the plea and "they gave me 30 years for something I didn't do and I took my plea back." Dr. Gruenberg testified that this statement showed that defendant understood he took a 30-year sentence in his plea. Initially, defendant stated that he took his plea back because he was sent to Menard prison, which is "very rough" and defendant could not "survive there." Dr. Gruenberg testified that defendant's penitentiary records showed that defendant expressed an unhappiness about being at Menard and requested to be moved to a prison closer to his family. Dr. Gruenberg testified that there was no mention in these records that defendant felt that he should have been sent to a hospital.

Dr. Gruenberg testified that it was significant that defendant recalled that he had been told in court that he had 30 days to withdraw his guilty plea and defendant was able to discuss the matter with his cellmate, who assisted defendant in going to the law library and writing the motion. Dr. Gruenberg testified that this showed quite a bit of sophistication and higher "executive functioning." Defendant also stated that he was able to get alcohol and cannabis in jail, which Dr. Gruenberg testified showed that defendant was able to socialize and plan with

-19-

other inmates to get contraband.

Dr. Gruenberg acknowledged that defendant had some deficits from his head injury, but these deficits did not preclude fitness. Dr. Gruenberg testified that defendant is fit if on his medication, and there was no indication that defendant was not on his medication when he entered his plea. Dr. Gruenberg also testified that there is no indication in the record that defendant decompensated anywhere near the time of his plea or post plea.

Assistant Public Defender Dayna Woodbury testified that she was assigned to defendant's case in June 2001. Woodbury described that nature of the case as a gang-related retaliatory shooting where defendant was charged as the shooter. Woodbury testified that on October 20, 2003, the prosecutor offered defendant a 30-year sentence on a plea of guilty but mentally ill. Woodbury testified that she considered this to be a good offer given the facts of the case and that if defendant was found guilty of personally shooting the victim, the minimum sentence was 45 years in prison. Woodbury testified that even if defendant was not found to be the shooter in this case, he faced a sentencing range of 20 to 60 years based on his prior attempted murder conviction in connection with a previous drive-by shooting.

Woodbury testified that she explained the offer to defendant and that he could still go to trial but the likelihood of winning was poor. Woodbury explained to defendant that if he was found guilty, his minimum sentence would be 45 years. Woodbury also explained that if he took the plea, there was a possibility that defendant would go to a separate unit in prison, as when he first entered the jail and went to the "RTU" unit. Woodbury testified that during this conversation, defendant's demeanor was good, but defendant wanted a lesser sentence of 20 or

25 years in exchange for his plea. As a result, Woodbury scheduled a Rule 402 ( 177 Ill. 2d R. 402) conference, but the judge would not go lower than a 30-year sentence. Woodbury told defendant that the prosecutor was making a one-time offer and would not give the same offer after they pursued pretrial motions. Woodbury also told defendant that he could either go to trial and pursue pretrial motions but a jury finding of not guilty was unlikely, or defendant could accept the plea agreement. Woodbury testified that she never promised defendant that he would be sent to the hospital. Woodbury testified that she told defendant that they would assess him and if he needed treatment he would receive it, then he could be placed in the general prison population.

Woodbury testified that she spoke with Oussama and Colleen outside the courtroom and Woodbury showed them police reports and statements from defendant's case. Woodbury spoke to Oussama and Colleen about the plea offer but made no promises about defendant going to a hospital instead of the general prison population. Oussama and Colleen spoke with defendant without Woodbury being present. After meeting with defendant, Oussama indicated that defendant was going to take the plea offer and Oussama told defendant "not to worry, just keep acting or playing crazy" so that when he went to prison he could go to the hospital unit. Woodbury testified that following the entry of his plea, defendant flashed Latin King signs at the victim's family. When Woodbury asked him why he flashed gang signs, defendant stated that "It's too much time. I was there, but I didn't shoot anybody." Woodbury testified that this was the first time defendant admitted being there to her and she explained to defendant that if he was there, he was accountable for the shooting. Defendant indicated that he wanted to appeal his

sentence but did not ask to withdraw his plea. Woodbury testified that she had no *bona fide* doubt of defendant's fitness and that defendant "absolutely knew what was going on, particularly when he turn[ed] around and he [did] that gang sign." Woodbury explained that in her motion for continuance and at other times on the record, she indicated that defendant was not fit because she could not communicate with him and defendant continually changed his version of events. Woodbury testified that she did not have a *bona fide* doubt of his fitness, that she thought defendant "knew exactly what he was doing," and she wanted "to have a doctor examine him" because "he is deceptive, I feel he is deceptive, but I am not a doctor."

Following the hearing, the circuit court denied defendant's motion to withdraw his plea, finding that the allegations were not supported by any credible evidence. The court entered oral findings, supplemented by a written order on October 14, 2005. In its oral findings the circuit court noted that defendant's professed difficulties with the English language and claim of a lack of recollection showed that defendant was manipulative throughout the proceedings.

## II. ANALYSIS

### A. Defendant's Fitness to Enter a Plea

On appeal, defendant first contends that the circuit court erred in denying defendant's motion to withdraw his guilty plea, where the manifest weight of the evidence showed that defendant was unfit to waive his right to trial and enter a guilty plea based on his organic brain damage.

Ordinarily, the decision whether or not to allow a defendant to withdraw his guilty plea is a matter within the discretion of the circuit court and will not be disturbed absent an abuse of that

1-05-3656

discretion. People v. Manning, 227 Ill. 2d 403, 411-12 (2008). A defendant does not have an absolute right to withdraw his guilty plea, but a defendant should be allowed to withdraw his plea where his plea was not constitutionally entered. Manning, 227 Ill. 2d at 412. A defendant may challenge the constitutionality of his guilty plea by alleging that the plea of guilty was not made voluntarily or with full knowledge of the consequences. Manning, 227 Ill. 2d at 412.

Defendant first asserts that due to organic brain damage, he was cognitively and intellectually impaired, so that he was unable to comprehend the plea process and the relinquishment of his constitutional rights. The due-process clause of the United States Constitution (U.S. Const., amend. XIV) prohibits the conviction and sentencing of a defendant who is not fit to stand trial. People v. Gilbert, 379 Ill. App. 3d 106, 112 (2008). A defendant is presumed fit to stand trial and is fit to plead guilty, stand trial, or be sentenced if he is able to understand the nature and purpose of the proceedings against him or to assist in his defense. People v. Williams, 364 Ill. App. 3d 1017, 1023 (2006); Gilbert, 379 Ill. App. 3d at 112. In general, limited intellectual ability - without more - does not render a defendant unfit. Williams, 364 Ill. App. 3d at 1023. Additionally, a defendant may be competent to stand trial even though his mind is otherwise unsound. People v. Woodard, 367 Ill. App. 3d 304, 320 (2006). Moreover, the mere existence of a mental disturbance or an instance of psychiatric treatment is not sufficient to create a *bona fide* doubt of a defendant's fitness. Woodard, 367 Ill. App. 3d at 319. The circuit court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence. People v. Logan, 352 Ill. App. 3d 73, 82 (2004).

We find that the circuit court did not abuse its discretion in denying defendant's motion

-23-

1-05-3656

to withdraw his plea of guilty but mentally ill where the evidence established that defendant was fit to stand trial and enter a plea in this case. At the hearing on defendant's motion, Dr. Nowak testified, as defendant's expert, that she diagnosed defendant with psychotic disorder and dementia due to brain injury, which is the loss of ability to function. Dr. Nowak testified that defendant had very basic or limited understanding of the court proceedings, and defendant was unable to understand the considerations in order to plead or withdraw his plea. Dr. Nowak testified that defendant was unable to evaluate his chances, examine the State's evidence, and compare strategy for trial versus pleading. Dr. Nowak testified that her opinion was that defendant did not understand the nature of the plea process in any functional way and was not competent to plead.

The State's experts offered testimony in sharp disagreement with Dr. Nowak. Dr. Markos disagreed that defendant was suffering from dementia due to head trauma. While Dr. Markos did not dispute defendant's prior psychiatric or neurological damage, Dr. Markos testified that defendant's recovery had progressed to the point that he was not presently globally impaired. Dr. Markos also testified that defendant did not have the medical or psychiatric symptoms of an individual with serious organic mental disorder or brain injury because those conditions are progressive. Rather, defendant had shown significant improvement since his brain injury. Dr. Markos testified that defendant might have mild cognitive deficits, but it did not preclude fitness. Dr. Markos concluded that defendant's intellectual functioning was sufficient to support the conclusion that defendant had the mental capacity to plead or to withdraw his plea.

Dr. Markos also noted that in defendant's interaction with other evaluators, defendant

-24-

appeared to be manipulative. During other evaluations, defendant minimized his knowledge concerning the roles of courtroom personnel. However, defendant's comments to Dr. Markos demonstrated an understanding of more sophisticated procedures, such as motions for discovery and his right to withdraw his plea within 30 days. Defendant was also able to provide a complete background history and describe recent events, including living in jail.

Defendant's professed difficulties with the English language also support Dr. Markos' opinion that defendant was manipulative. Winstead, defendant's former probation officer, testified that he conducted all conversations with defendant in English. In addition, Dr. Gruenberg conducted her entire forensic interview of defendant in English without any difficulty. Dr. Markos also testified that while he had an Arabic-English translator present, he was able to converse with defendant in English.

Dr. Gruenberg concurred with Dr. Markos' appraisal of defendant. Dr. Gruenberg found no evidence of decompensation or mental health difficulties at the time of the plea, and concluded that defendant had the capacity and was fit to enter a guilty plea on October 20, 2003.

In contrast to Dr. Nowak's opinions concerning defendant's memory deficits, Dr. Gruenberg noted that during her examination, defendant was able to discuss his personal history and his past head injury. Defendant was able to recall details including his age when he came to this country, where he came from, the number of siblings he had, and that he was an auto mechanic prior to his head injury. Defendant also knew what he was charged with and stated that he was in a car with a gang member at the time of the shooting in this case, but that defendant himself was not a gang member. Defendant stated that he was going with the gang member to a

party and the gang member shot the victim in this case. Dr. Gruenberg testified that defendant provided this account clearly, quickly, and in a very easily understandable manner. Dr. Gruenberg had noted that in the record prior to his plea, defendant had stated that he had no recollection of the shooting and was not present when it occurred. Dr. Gruenberg testified that defendant's different statements regarding the event suggested malingering, in that at some point, defendant had told a different type of story for his own benefit.

Dr. Gruenberg testified that defendant also knew how long he had been in jail and that he had no bond. Defendant was able to describe the roles of his defense attorney, the prosecutor and the judge in court proceedings. When asked how he decided whether to enter a plea of guilty but mentally ill, defendant responded "that's when I talked to my attorney," which Dr. Gruenberg testified indicated that defendant realized it was important to consult a legal expert to discuss the status of his case and help him make decisions. Dr. Gruenberg testified that it was significant that defendant recalled that he had been told in court that he had 30 days to withdraw his guilty plea and defendant was able to discuss the matter with his cellmate, who assisted defendant in going to the law library and writing the motion. According to Dr. Gruenberg, those efforts demonstrated not only an understanding of the plea process, but also a certain amount of sophistication and higher "executive functioning."

In addition, Dr. Coleman testified that while defendant does suffer from memory deficit, there was a suggestion from tests that she administered that defendant was exaggerating at least some of those memory deficits. Dr. Coleman explained that "malingering" is the intentional exaggeration or false report of psychological symptoms or disorder for some secondary gain. Dr.

Coleman testified that she did not believe that defendant was fully malingering, but that there was some exaggeration. Dr. Coleman also reviewed the previous reports by Forensic Clinical Services Drs. Foran and Echevarria, and observed inconsistencies in the amount of information that defendant could remember. Dr. Coleman testified that this observation corroborated her opinion that defendant was exaggerating the severity of his memory deficits.

Dr. Coleman characterized defendant's memory deficits as mild to moderate and testified that based on her testing, defendant did not seem to have a severe memory impairment. Dr. Coleman testified that she did not specifically evaluate defendant for fitness, but that the deficits noted during defendant's testing would not necessarily preclude his fitness to stand trial.

Further, defendant's trial counsel, Assistant Public Defender Woodbury, testified that she had no *bona fide* doubt of defendant's fitness and that defendant "absolutely knew what was going on, particularly when he turn[ed] around and he [did] that gang sign." Woodbury explained that in her motion for continuance and at other times on the record, she indicated that defendant was not fit because she could not communicate with him and defendant continually changed his version of events. Woodbury testified that she did not have a *bona fide* doubt of his fitness, that she thought defendant "knew exactly what he was doing," and she wanted "to have a doctor examine him" because "he is deceptive, I feel he is deceptive, but I am not a doctor."

Accordingly, the evidence at the hearing on defendant's motion to withdraw his plea of guilty but mentally ill established that while defendant sustained head injuries, most of the resulting impairment had dissipated. While defendant may have mild cognitive and intellectual deficits, such deficits did not preclude fitness in this case. Rather, the evidence showed that

defendant was fit to stand trial and enter a guilty plea, where defendant was able to understand the nature and purpose of the proceedings against him and assist in his defense. Williams, 364 Ill. App. 3d at 1023. Further, we note the significance of the fitness evaluations conducted during the entire pendency of this case. The record shows that the State has demonstrated throughout the proceedings that defendant was fit for trial and that defendant had the mental capacity to comprehend the plea process and the relinquishment of his constitutional rights.

While defendant argues that the circuit court should have placed greater weight on Dr. Nowak's testimony, we note that Dr. Nowak's opinion was somewhat compromised by the fact that she allowed defense counsel to be present during her clinical interview. Dr. Nowak acknowledged that defense counsel was not only present, but an active participant. Dr. Markos testified that it was not the custom of Forensic Clinical Services to permit counsel to be present during evaluations, because court-ordered examinations must be independent and objective evaluations. Dr. Markos also noted the need to cultivate rapport between the evaluator and the defendant, and that the presence of defense counsel could create the perception that counsel was present to protect the defendant from the examiner.

Defendant cites American Bar Association standards authorizing the presence and participation of counsel during a clinical examination (ABA Criminal Justice Mental Health Standards, Standard #7-3.6(c)), in support of his argument that it was appropriate for defense counsel to be present during Dr. Nowak's examination. However, this standard has not been adopted in Illinois. In People v. Mahaffey, 166 Ill. 2d 1, 19-20 (1995), our supreme court held that a defendant is not entitled to have defense counsel present during a court-ordered psychiatric

examination conducted by prosecution experts. In so holding, our supreme court relied on the United States Supreme Court decision in Estelle v. Smith, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981). In Estelle, the Supreme Court held that defense counsel must be given advance notice of a fitness examination, but the Supreme Court expressly did not rule that a defendant is entitled to the presence of counsel at the exam. Rather, the Court stated, "Respondent does not assert, and the Court of Appeals did not find, any constitutional right to have counsel actually present during the examination. In fact, the Court of Appeals recognized that 'an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination.' [Citations.]" Estelle, 451 U.S. at 470 n.14, 68 L. Ed. 2d at 374 n.14, 101 S. Ct. at 1877 n.14. Our supreme court in Mahaffey concluded, "As the Supreme Court recognized in Estelle, there are valid diagnostic reasons for refusing to permit counsel to be present during a psychiatric exam." Mahaffey, 166 Ill. 2d at 20. Accordingly, we find defendant's argument that it was appropriate for defense counsel to be present during Dr. Nowak's examination unconvincing.

B. Defendant's Claim That His Plea Was Based on a Misapprehension of Facts

Defendant next contends that his plea of guilty but mentally ill was not entered voluntarily where defendant entered the plea with the mistaken belief that he would be sent to a hospital rather than the general prison population. A defendant may seek to withdraw his guilty plea on the grounds that the plea was entered based on a misapprehension of fact. People v. Spriggle, 358 Ill. App. 3d 447, 450-51 (2005). " 'In the absence of substantial objective proof showing that a defendant's mistaken impressions were reasonably justified, subjective

impressions alone are not sufficient grounds on which to vacate a guilty plea.' " <u>Spriggle</u>, 358 Ill. App. 3d at 451, quoting <u>People v. Artale</u>, 244 Ill. App. 3d 469, 475 (1993). Defendant also bears the burden of proving that his mistaken impression was "objectively reasonable under the circumstances existing *at the time of the plea*." (Emphasis in original.) <u>Spriggle</u>, 358 Ill. App. 3d at 451.

We find that defendant has failed to demonstrate that his plea was entered based on a mistaken belief that he would be hospitalized rather than sent to the general prison population. Following defendant's plea of guilty but mentally ill, the circuit court provided the following admonishment:

> "THE COURT: Under the law, of course, you understand that you don't get day-for-day credit on this crime of first degree murder. You do 100 percent of the time. That means if you were sentenced to 30 years, you will do 30 years. On a finding of guilty but mentally ill, you may spend a portion of that time in a hospital. If * * * hospitalization is not necessary for you, you will spend that time in the department of corrections in confinement. Do you understand that?
>
> THE DEFENDANT: Yes, your honor."

Accordingly, the circuit court clearly admonished defendant that if hospitalization was not needed, he would serve his time in the general prison population.

While defendant's brother and sister-in-law testified that defense counsel told them that if defendant pled guilty but mentally ill, defendant would be hospitalized, Assistant Public Defender Woodbury testified to the contrary. Woodbury testified that she did not promise

defendant or his family members that if defendant pled guilty but mentally ill, he would spend his incarceration in a hospital. Woodbury testified that she told defendant that they would assess him and if he needed treatment he would receive it, then he could be placed in the general prison population.

In addition, on the basis of his clinical interview, Dr. Markos concluded that defendant's motion to withdraw the plea was not premised upon the belief that he should have been hospitalized, but upon defendant's belief that 30 years was too much time for a crime that he denied committing. Also, Dr. Gruenberg testified that defendant initially did not tell her anything about going to the hospital, but defendant stated that he took the plea back because the prison at Menard was very rough and he could not survive there. Further, Dr, Gruenberg's opinion was supported by defendant's prison evaluation at Menard, where defendant expressed unhappiness about being there and requested that he be transferred to the prison at Dixon to be closer to his family. Defendant's prison evaluation made no mention of any feeling that he should have been sent to a hospital. Further, in his *pro se* motion to withdraw his guilty plea, defendant alleged that: (1) his attorney wanted him to plead guilty to charges that he did not understand; (2) he advised his attorney that he was not guilty of the charges; (3) he signed documents when his attorney ordered him to do so, but defendant did not understand the contents; (4) his attorney forced him to plead guilty; (5) he was under psychotropic medication before and during the plea; and (6) he was not competent to enter a plea. Defendant's failure to include his present claim in his *pro se* motion reinforces the conclusion that defendant's plea was not based on a mistaken belief that he would receive hospitalization. Therefore, we find that

1-05-3656

defendant has failed to show that his plea was not voluntarily entered.

### C. Fairness of Defendant's Hearing

Defendant next contends that he was denied a fair hearing where the State improperly used the fact that defendant pursued his right to file a motion to withdraw his guilty plea to rebut defendant's claim of unfitness. We initially note that defendant forfeited this issue for review by failing to object at trial and raise the issue in a posttrial motion. See People v. Coleman, 227 Ill. App. 3d 426, 433 (2008). Forfeitur aside, we find that defendant's claim is without merit.

The decision to admit or exclude evidence is within the sound discretion of the circuit court, and that decision will not be overturned absent a showing of an abuse of discretion. People v. Rojas, 359 Ill. App. 3d 392, 401 (2005).

Defendant cites Wainwright v. Greenfield, 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634 (1986), in support of his argument. In Wainwright, the Supreme Court held that the prosecutor's use of the defendant's post-M*iranda* silence as evidence of the defendant's mental state violated due process. In that case, the prosecutor asked each of the two arresting officers about multiple occasions on which the defendant invoked his right to remain silent following *Miranda* warnings. The Defendant had pled not guilty by reason of insanity and the prosecutor sought to show that the defendant's decision to remain silent after his arrest demonstrated his mental competence. Wainwright, 474 U.S. at 286-87, 88 L. Ed. 2d at 627, 106 S. Ct. at 635-36. The Supreme Court concluded that unfairness would result from using post-*Miranda* silence as evidence of sanity where the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized, then the State seeks to make use of the defendant's

-32-

1-05-3656

exercise of those rights in obtaining his conviction. Wainwright, 474 U.S. at 286-87, 88 L. Ed. 2d at 627, 106 S. Ct. at 635-36.

Unlike Wainwright, the present case does not involve the State's use of defendant's exercise of his *Miranda* rights. Rather, defendant asserts that he had the right to file a motion to withdraw his guilty plea and that the State improperly used his exercise of that right to show that defendant was fit. However, unlike *Miranda*, defendant's right to file a motion to withdraw his guilty plea does not invoke a constitutional right, but is a right conferred by Illinois Supreme Court Rule 604(d) (210 Ill. 2d R. 604(d)). Also, a defendant does not have the absolute right to withdraw a guilty plea. Manning, 227 Ill. 2d at 412.

In addition, the record shows that Dr. Markos' and Dr. Gruenberg's testimony regarding defendant's filing of his *pro se* motion constituted only several comments among the multitude of evidence presented by the State to demonstrate defendant's fitness. Dr. Markos and Dr. Gruenberg explained the method in which defendant sought out assistance from a fellow inmate and worked with him to file his motion to withdraw his guilty plea, as a demonstration that defendant understood court proceedings. We find no abuse of discretion by the circuit court in allowing this evidence.

D. Defendant's Susceptibility to Outside Influence

Defendant lastly contends that the circuit court improperly excluded Dr. Nowak's opinion regarding defendant's susceptibility to outside influence to plead guilty but mentally ill. The record shows that Dr. Nowak testified that defendant "was heavily influenced by his perception of the promise of hospitalization and that perception did unduly affect his acceptance of the

-33-

1-05-3656

plea." The State objected that this opinion invaded the province of the circuit court and the court sustained the objection.

Expert testimony is proper where such testimony is needed to explain matters beyond the common knowledge of ordinary citizens, and where such testimony will aid the fact finder in reaching its conclusion. People v. Bennett, 376 Ill. App. 3d 554, 571 (2007). However, " 'the admission of evidence remains within the [sound] discretion of the trial court and will not be reversed absent an abuse of discretion.' " Bennett, 376 Ill. Ap. 3d at 571, quoting People v. Wood, 341 Ill. App. 3d 599, 608 (2003).

In Bennett, this court held that the defendant was not entitled to present expert testimony that he was susceptible to police interrogations and suggestions based on his intellectual abilities. Bennett, 376 Ill. App. 3d at 572. This court noted that the defendant's claim was not beyond the understanding of ordinary citizens, nor a concept difficult to understand. Bennett, 376 Ill. App. 3d at 572. Similarly, in this case, Dr. Nowak's testimony that defendant was heavily influenced by his perception of the promise of hospitalization based on defendant's brain injury, is not beyond the understanding of ordinary citizens and the trier of fact could have reached the same conclusion as the expert based on the testimony presented at the hearing. In addition, the circuit court did not preclude Dr. Nowak from testifying that the most significant reason that defendant plead guilty but mentally ill was that his family told defendant he would be going to the hospital. Further, a great deal of testimony was presented relating to defendant's brain injury and brain functioning. Accordingly, we cannot say that the circuit court abused its discretion by excluding the portion of Dr. Nowak's testimony regarding defendant's susceptibility.

### III. CONCLUSION

For the above reasons, we affirm the circuit court's determination denying defendant's motion to withdraw his plea of guilty but mentally ill.

Affirmed.

THEIS and CUNNINGHAM JJ., concur.